UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PAUL BROWN,

                        Plaintiff,

       -v-

CITY OF NEW YORK,

                        Defendant.

CIVIL ACTION NO.: 21 Civ. 4632 (PGG) (SLC)

**REPORT AND RECOMMENDATION**

**SARAH L. CAVE**, United States Magistrate Judge.

**TO THE HONORABLE PAUL G. GARDEPHE**, United States District Judge:

## I. INTRODUCTION

Pro se Plaintiff Paul Brown ("Brown") brings this action under 42 U.S.C. § 1983, alleging that Defendant City of New York (the "City") violated his constitutional rights when he was a detainee at the Anna M. Kross Center at Rikers Island ("AMKC") by failing to take adequate steps to mitigate the threat of COVID-19. (ECF No. 1 (the "Complaint")). Before the Court is the City's motion for summary judgment. (ECF No. 33 (the "Motion")). For the reasons set forth below, I respectfully recommend that the Motion be GRANTED and the Complaint be DISMISSED WITH PREJUDICE.

## II. BACKGROUND

### A. Factual Background

The Court summarizes the undisputed facts from the documents the City has submitted in support of the Motion, (ECF Nos. 37-1 – 37-9; 39-1; 39-2), and the City's statement pursuant to Local Civil Rule 56.1 (ECF No. 35). The Court describes the facts "in the light most favorable

to" Brown, the non-movant.  <u>Wandering Dago, Inc. v. Destito</u>, 879 F.3d 20, 30 (2d Cir. 2018);[1] <u>see</u>

<u>Vasquez v. Reilly</u>, No. 15 Civ. 9528 (KMK), 2018 WL 2768648, at *4–5 (S.D.N.Y. June 7, 2018).

### 1. **Brown**

From December 20, 2020 until May 13, 2021, Brown was detained at AMKC.

(ECF No. 1 at 4; <u>see</u> ECF Nos. 35 ¶ 2; 41 ¶ 6).  On admission to AMKC, Brown was provided with

an Inmate Handbook, which describes the steps in the Department of Correction's ("DOC")

Inmate Grievance Resolution Process ("IGRP").  (ECF No. 37 ¶¶ 42–43).  Brown alleges that his

"[h]ealth [was] at [r]isk at an all time [h]igh [d]uring [his] incarceration[.]"  (ECF No. 1 at 4).  He

alleges that unnamed employees at AMKC showed "obvious [d]isregard of the [s]ocial [d]istance

[r]ules placed in the [d]orms of Rikers Island," in violation of his "[h]uman [r]ights[.]"  (<u>Id.</u>)  He

contends that, at AMKC, there was "[n]o [s]ocial [d]istanc[ing], [n]o testing, [and n]o [personal

protective equipment ('PPE')] [d]istributed to any [d]etainee."  (<u>Id.</u>)  He asserts that his "[c]ry for

help [h]ave [sic] been ignored[,]" leading him to file the Complaint.  (<u>Id.</u>)  Due to his "[b]eing an

asthmatic[,]" he is "in fear for [his] life."  (<u>Id.</u> at 5).  Brown seeks $10,000,000 in damages "for the

blatant [d]isregard of [his] human [r]ights during [a] [p]andemic."  (<u>Id.</u>)

During his detention at AMKC, Brown was screened for COVID-19 symptoms at least 17

times, and was tested, with negative results, three times.  (ECF No. 35 ¶¶ 67–68).  His health

records, which contain records both before and during his detention at AMKC, do not reflect a

diagnosis or symptoms of asthma, or that he sought any medical care for asthma.

---

[1] Unless otherwise indicated, all internal quotation marks and internal citations are omitted from case citations.

(ECF Nos. 35 ¶ 69; see ECF No. 40-1 at 144, 149 (indicating that Brown did not have asthma as of September 18, 2019)).[2]

Between December 20, 2020 and April 22, 2021, Brown filed two grievances related to the COVID-19 pandemic.  (ECF No. 41 ¶ 4; see ECF No. 35 ¶ 74).  In a grievance dated April 6, 2021 (the "First Grievance"), Brown stated:  "Social Distancing Not Being Upheld[,]" and "I do not have 6 feet between other detainees."  (ECF No. 41 ¶ 4).  The DOC Office of Constituent Grievance Services ("OGCS") responded in a Disposition Form (i.e., Form 7102R) that his First Grievance had been sent to the office of the Warden of AMKC.  (Id.)  In a grievance dated April 16, 2021 (the "Second Grievance"), Brown stated:

> My complaint is about social distancing.  How is it that the whole world can be socially distante [sic] but Rikers.  I can't do it, we have been told social distance is over in here.  Having a shot or a "vaccine" shot doesn't [sic] mean that virus and its variants can be spreaded [sic] we have 42 people in this dorm the max was supposed to b [sic] 25.

(Id. ¶ 5).  The Second Grievance was returned to Brown as a duplicate of the First Grievance.  (Id.)  When Brown was discharged from AMKC on May 13, 2021, "[d]ue to extraordinary circumstances posed by the COVID-19 pandemic," OGCS had not yet closed its investigation into the First Grievance.  (Id. ¶ 6).

### 2.  COVID-19 Protocols at AMKC

As an initial matter, DOC is not informed of a detainee's health condition; rather, that information is possessed by Correctional Health Services ("CHS").  (ECF No. 37 ¶ 7).  CHS conducts medical evaluations of detainees and advises DOC of the appropriate housing facility for any person with a medical condition who might need additional medical services or care.  (Id.)

---

[2] Brown's medical records were filed under seal.  (See ECF Nos. 39 ¶ 3; 39-1; 40-1; 62).

Brown's housing in AMKC, a general population housing area, reflects CHS's determination that he did not need specialized care.  (Id.)

In early 2020, DOC, in conjunction with CHS, prepared the COVID-19 Action Plan (the "COVID-19 Plan").  (ECF No. 37 ¶ 8).[3]  Beginning on or around May 4, 2020, any individual newly admitted to a DOC facility—including AMKC—was offered a COVID-19 test.  (ECF Nos. 35 ¶¶ 5, 42; 37 ¶ 9).  Inmates who agreed to be tested were held in a housing area for newly admitted individuals awaiting COVID-19 test results.  (ECF Nos. 35 ¶¶ 5, 42; 39-2 ¶ 8).  Only after testing negative would a detainee be transferred to general population housing.  (ECF Nos. 35 ¶ 5; 39-2 ¶ 8).  New detainees who declined testing were quarantined for ten to fourteen days before being transferred.  (ECF Nos. 35 ¶ 5; 39-2 ¶ 8).  A new detainee who tested positive or exhibited symptoms of COVID-19 was placed in a special housing unit, reopened for that purpose. (ECF No. 35 ¶ 19; see ECF No. 39-2 ¶¶ 11–12).  These protocols were in place during the entire period Brown was at AMKC.  (ECF Nos. 35 ¶ 5; 37 ¶ 9).

CHS continued to offer testing to detainees at other points, including at a detainee's request, and monitored detainees for symptoms of the virus.  (ECF Nos. 35 ¶¶ 6, 43; 37 ¶¶ 10–12; 39-2 ¶ 9).  In the event of a new case of COVID-19, CHS advised DOC to transfer the detainee to an area designated for those with an active COVID-19 infection, and that the exposed housing areas be designated as Asymptomatic Exposed ("AE").  (ECF Nos. 35 ¶¶ 49–50; 39-2 ¶¶ 16–17). AE units were maintained as "living cohorts" for fourteen days and offered subsequent rounds

---

[3] Additional measures DOC and AMKC implemented in response to COVID-19 are summarized in the Declarations of Tanisha Mills, Acting Assistant Chief of DOC (ECF No. 37) and Patricia Yang, Dr.P.H., Senior Vice President of CHS, a division of NYC Health + Hospitals (ECF No. 39-2).  The Court summarizes the measures most relevant to Brown's claim.

of testing to identify any new cases of COVID-19.  (ECF Nos. 35 ¶ 51; 39-2 ¶ 18).  Staff were also screened, tested, and informed of COVID-19 precautions, as well as steps to take following exposure to an infected individual.  (ECF Nos. 35 ¶¶ 12–16, 54–60; 37 ¶¶ 16–20; 39-2 ¶¶ 21–27).

The COVID-19 Plan also included informational, cleaning, and sanitizing protocols. (ECF Nos. 35 ¶ 9; 37 ¶ 13).  Informational posters throughout AMKC informed staff and detainees about the symptoms of COVID-19 and suggested precautions, including masking, proper hygiene, sleeping head to toe, and social distancing.  (ECF Nos. 35 ¶ 9; 37 ¶ 13; 37-1 at 2–3, 7–13).  Trained work crews conducted daily cleaning and sanitizing of housing units, dayrooms, common spaces, and transport buses, contact surfaces every two hours, and shower areas thrice daily. (ECF Nos. 35 ¶¶ 20–21; 37 ¶¶ 25–26).  DOC provided cleaning supplies near telephones in the housing units, provided each detainee a bar of soap, and stocked each unit's janitor closet with sanitizing solutions, cleaners, "gentle scrub," and mops, except in units where access to these supplies presented a security issue.  (ECF Nos. 35 ¶ 22–24; 37 ¶¶ 28–29).  Due to security concerns about detainees ingesting alcohol-based substances, DOC did not distribute hand sanitizer, and instead relied on sinks, soap, and water.  (ECF Nos. 35 ¶ 25; 37 ¶ 30).  Since March 2020, DOC has operated with 100% outside air and, in accordance with the recommendation from the Centers for Disease Control and Prevention, upgraded all filters from MERV-8 to MERV-13.  (ECF Nos. 35 ¶ 27; 37 ¶ 32).

DOC also took several steps to increase social distancing in its facilities.  Following a combined effort among the courts, the Mayor's Office, the District Attorney's Office, the Legal Aid Society, and DOC, approximately 1,500 non-violent incarcerated persons were released between March 16, 2020 and June 4, 2020 (before Brown arrived at AMKC).  (ECF Nos. 35 ¶ 28;

37 ¶ 33).  The Eric M. Taylor Center, which had closed several months earlier, was reopened for the period from November 2020 through May 2021 to house detainees who tested positive. (ECF Nos. 35 ¶¶ 30, 46; 37 ¶ 35).  Where possible in housing units, DOC worked to ensure that there was an empty bed between detainees, and encouraged detainees to refrain from sitting on each other's beds and to sleep head-to-foot to increase separation.  (ECF Nos. 35 ¶ 31; 37 ¶ 36). To increase awareness of social distancing measures, DOC painted cues on chairs and benches, posted notices that describe the enhanced social distancing guidelines, and trained officers to communicate about the purpose of these measures.  (ECF Nos. 35 ¶¶ 32–33; 37 ¶¶ 37–38). Masks were provided to all detainees and staff, required during recreation, and available at officer stations.  (ECF Nos. 35 ¶ 34; 37 ¶ 39).  Officers were required to wear masks when inside DOC facilities, other than while eating or drinking, and faced discipline for failing to do so. (ECF Nos. 35 ¶ 34; 37 ¶ 39).

Finally, beginning in January 2021, CHS began offering the COVID-19 vaccine to high-risk inmates and to DOC staff, and in March 2021, to all incarcerated individuals.  (ECF Nos. 35 ¶¶ 10–11, 17, 48; 37 ¶¶ 14–15; see ECF No. 37-6).  On October 29, 2021, a vaccine mandate went into effect, on a rolling basis, for all City employees.  (ECF Nos. 35 ¶ 18; 37 ¶ 22).  The vaccine remains available on request and DOC encourages detainees to receive the vaccine.  (ECF No. 37 ¶ 15).

The COVID-19 Plan was enforced through inspections by DOC and by the New York State Commission of Correction ("SCOC").  (ECF Nos. 35 ¶¶ 26, 35–36; 37 ¶¶ 31, 40).  Following several inspections, SCOC observed that DOC employees, inmates, and visitors were being screened for COVID-19, signage was posted, disinfecting procedures were in place, and face coverings were

used. (ECF Nos. 35 ¶ 35; 37 ¶ 40). SCOC made two recommendations—regarding the use of PPE and hand sanitizer—both of which DOC addressed. (ECF Nos. 35¶ 36; 37 ¶ 40; 37-8).

## B. **Procedural Background**

On April 22, 2021, Brown delivered the Complaint to prison authorities for mailing, and the Complaint was docketed on May 21, 2021. (ECF No. 1 at 7). With the Complaint, Brown filed an application for the appointment of pro bono counsel (the "First Application"). (ECF No. 2). On June 17, 2021, the Honorable Paul G. Gardephe granted Brown's request to proceed in forma pauperis and denied the First Application on the grounds that it was "too early in the proceedings for the Court to assess the merits of the action[.]" Brown v. N.Y.C. Dep't of Corr., No. 21 Civ. 4632 (PGG), 2021 WL 2480411, at *2 (S.D.N.Y. June 17, 2021). Following an order of service, on September 13, 2021, the City filed an answer to the Complaint. (ECF Nos. 8; 16). On October 5, 2021, the Court denied without prejudice Brown's application for the appointment of pro bono counsel and for discovery of log books and videos from AMKC. (ECF No. 18; see ECF No. 13). See also Brown v. City of New York, No. 21 Civ. 4632 (PGG) (SLC), 2021 WL 4554729, at *2–4 (S.D.N.Y. Oct. 5, 2021).

On March 2, 2022, the Court held an initial case management conference, in which Brown participated, following which the Court ordered Brown to serve responses to the City's interrogatories and set a fact discovery deadline of May 2, 2022. (ECF Nos. 24; 26; see ECF min. entry Mar. 2, 2022). On May 20, 2022, the City submitted a status letter, requesting an extension of time to submit the Motion and reporting that it had produced to Brown "all documents produced in connection with the related Michael Lee v. City of New York et al. matter, as well as

a copy of [his] medical record and inmate and movement files[,]" and that Brown did not serve any discovery requests.  (ECF No. 28).

On May 25, 2022, Brown submitted a letter asking the Court for "an immediate ruling in [his] favor" due to the City's alleged failure to comply with discovery orders.  (ECF No. 30).  The Court denied that request, reminding Brown that "the deadline for completion of discovery was May 2, 2022[,]" and therefore, the discovery period was now over.  (Id.)  On July 29, 2022, the City filed and served the Motion, along with the notice to pro se litigants required by Local Civil Rule 56.2 (the "56.2 Notice")).  (ECF Nos. 33–37; 39–42).  On August 9, 2022, Judge Gardephe referred the Motion to the undersigned for a report and recommendation.  (ECF Nos. 43–44).

On September 2, 2022, the Court noted that Brown's opposition to the Motion was past due, but granted a final extension until October 18, 2022, warning him that the "failure to respond will result in the Court ruling on the Motion based on Defendant's submissions alone and may result in dismissal of this action with prejudice."  (ECF No. 45 (the "Sept. 2 Order")).  The Court then received a letter from Brown, stating that he opposed the Motion because "the [d]efendant is clearly using [Brown's] lack of knowledge of the legal system against [him]."  (ECF No. 46 at 4 (the "Sept. 2 Letter")).[4]  Brown did not include with the Sept. 2 Letter any counter-statement of material facts or legal argument, but provided his "testimony" that , although his housing unit had air conditioning, "social distancing was . . . not possible[,]" "there was never any hand sanitizer[,]" and the masks he was given "were not to prevent the spread of the virus."  (Id. at 2).  He added that he submitted five grievances, two of which he had received responses.  (Id. at 3).  Brown also maintained that his older arrest records show his "[a]sthmatic

---

[4] The Court issued the Sept. 2 Order before the Sept. 2 Letter was docketed.  (ECF No. 46 at 5).

problem." (Id.)  He asserted that he was "in fear for [his] life" and "ask[ed] for something for mental anguish, stress, and [b]laten [sic] [d]isregard for the lives of mine [sic] and the other[s] that went through this." (Id. at 4).

On November 21, 2022, the City filed a reply.  (ECF No. 53 (the "Reply")).  Brown submitted a second letter, dated November 23, 2022, "asking that the Court[] settle this matter in [his] favor on the grounds that the Defendant has not yet given [him] nor the Court[] any updates [r]egarding this case[.]"  (ECF No. 56 (the "Nov. 23 Letter")).  The Court denied Brown's request, directed the Clerk of the Court to provide Brown with another copy of the Reply and a copy of the docket, and advised that it would issue this Report and Recommendation "in due course."  (ECF No. 57).  Brown submitted a third letter requesting a settlement conference (the "Dec. 8 Letter," with the Sept. 2 and Nov. 23 Letters, the "Letters"), which the Court denied because the City indicated that it did not wish to participate at this time.  (ECF Nos. 58–61).

## III. DISCUSSION

### A. Legal Standards

#### 1. Motion for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Darnell v. Pineiro, 849 F.3d 17, 22 (2d Cir. 2017); Byrd v. City of New York, No. 17 Civ. 2166 (AJP), 2018 WL 259316, at *3 (S.D.N.Y. Jan. 2, 2018).  "On a motion for summary judgment, the moving party bears the initial burden of establishing that no genuine factual dispute exists," and if the movant satisfies that burden, "the burden shifts to the nonmoving

party to 'set forth specific facts showing that there is a genuine issue for trial' . . . and to present such evidence that would allow a jury to find in his favor[.]" Blue v. City of New York, No. 14 Civ. 7836 (VSB), 2018 WL 1136613, at *5 (S.D.N.Y. Mar. 1, 2018) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).

To overcome a summary judgment motion, the nonmoving party "'must do more than simply show that there is some metaphysical doubt as to the material facts.'" Blue, 2018 WL 1136613, at *5 (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The nonmoving party must "cit[e] to particular parts of materials in the record" to show that "a fact . . . is genuinely disputed[.]" Fed. R. Civ. P. 56(c)(1); see Blue, 2018 WL 1136613, at *5; Byrd, 2018 WL 259316, at *3. Where a party "fails to properly address another party's assertion of fact as required by Rule 56(c), the court may[,]" inter alia, "'consider the fact undisputed for purposes of the motion[,]'" or "'grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it[.]'" Fed. R. Civ. P. 56(e)(2), (3); see Blue, 2018 WL 1136613, at *5.

Presented with a motion for summary judgment, the Court does not resolve contested factual issues, but rather determines whether any disputed issue of material fact exists. See Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987); Byrd, 2018 WL 259316, at *5. The applicable substantive law determines which facts are material "and which facts are irrelevant." Byrd, 2018 WL 259316, at *4. The Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in [his] favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995); Wandering Dago, 879 F.3d at

30; <u>Vasquez</u>, 2018 WL 2768648, at *1. Summary judgment must be denied "if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party." <u>Marvel Characters, Inc. v. Simon</u>, 310 F.3d 280, 286 (2d Cir. 2002); <u>see</u> <u>Byrd</u>, 2018 WL 259316, at *5 ("If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper.").

Local Rule 56.1(a) requires the moving party to submit a "short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." Local Civ. R. 56.1(a). In response, the non-moving party must submit "a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." Local Civ. R. 56.1(b). "A <u>pro</u> <u>se</u> litigant is not excused from this rule[,]" <u>Brandever v. Port Imperial Ferry Corp.</u>, No. 13 Civ. 2813 (KBF), 2014 WL 1053774, at *3 (S.D.N.Y. Mar. 13, 2014), and "[a] nonmoving party's failure to respond to a Rule 56.1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible." <u>T.Y. v. N.Y.C. Dep't of Educ.</u>, 584 F.3d 412, 418 (2d Cir. 2009); <u>Vasquez</u>, 2018 WL 2768648, at *1 n.1. In this case, the City served and filed its Rule 56.1 Statement, (<u>see</u> ECF No. 35), with the 56.2 Notice informing Brown of the potential consequences of not responding to the Motion. (<u>See</u> ECF Nos. 34; 42). Despite this notice, Brown did not submit a Rule 56.1 counter-statement, and therefore, the Court may conclude that the facts in the City's

Rule 56.1 Statement are uncontested and admissible. See Vasquez, 2018 WL 2768648, at *1 n.1; Brandever, 2014 WL 1053774, at *3.

Although Brown's Letters do not meet the requirements of the Federal Rules of Civil Procedure and this Court's Local Civil Rules, the Court has still afforded "special solicitude" to Brown, a pro se litigant, Tracy v. Freshwater, 623 F.3d 90, 100–01 (2d Cir. 2010), and exercised its discretion "to conduct an assiduous review of the record[,]" in deciding the Motion. Holtz v. Rockefeller & Co., 258 F.3d 62, 73 (2d Cir. 2001); Vasquez, 2018 WL 2768648, at *1 n.1 (collecting cases in which courts conducted independent reviews of the record where a pro se plaintiff had failed to submit a proper Rule 56.1 statement). The Court reads Brown's Complaint and other submissions "liberally and interpret[ing] them to 'raise the strongest arguments that they suggest.'" McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir. 1999) (quoting Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994)); see Hughes v. Rowe, 449 U.S. 5, 9 (1980) (noting that submissions of pro se litigants are "held 'to less stringent standards than formal pleadings drafted by lawyers'") (quoting Haines v. Kerner, 404 U.S. 519, 520 (1972)). Brown's pro se status, however, "does not exempt [him] from compliance with relevant rules of procedural and substantive law." Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006); Bennett v. James, 737 F. Supp. 2d 219, 226 (S.D.N.Y. 2010) (nonmoving pro se litigant "must produce specific facts to rebut the movant's showing and to establish that there are material issues of fact requiring a trial"), aff'd, 441 F. App'x 816 (2d Cir. 2011); Lee v. Coughlin, 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (nonmoving pro se plaintiff's "'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment") (quoting Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir. 1991)). Nor is the Court required to search the record to find genuine issues of

material fact that Brown failed to raise himself.  See Holtz, 258 F.3d at 73; Vasquez, 2018 WL 2768648, at *1 n.1 (disregarding plaintiff's factual assertions that lacked citation or contradicted his testimony); Berry v. Marchinowski, 137 F. Supp. 3d 495, 502 n.1 (S.D.N.Y. 2015) (same).

## 2. Section 1983

"Section 1983 grants a right of action to any 'citizen of the United States or other person within the jurisdiction thereof' who has been deprived of 'any rights, privileges, or immunities secured by the Constitution' or federal law by a person acting under color of state law." Hirsch v. City of New York, 300 F. Supp. 3d 501, 508 (S.D.N.Y.) (quoting 42 U.S.C. § 1983), aff'd, 751 F. App'x 111 (2d Cir. 2018); see Pridgen v. Jail, No. 22 Civ. 2294 (ER), 2022 WL 1082411, at *1 (S.D.N.Y. Apr. 6, 2022) ("Section 1983 provides that an action may be maintained against a 'person' who has deprived another of rights under the 'Constitution and Laws.'") (quoting 42 U.S.C. § 1983).  To state a Section 1983 claim, "a complaint must allege that the defendant (1) deprived the plaintiff of rights secured by the Constitution and laws of the United States, (2) while acting under color of state law."  Chamberlain v. City of White Plains, 986 F. Supp. 2d 363, 381 (S.D.N.Y. 2013) (citing 42 U.S.C. § 1983); see Lurch v. Chaput, No. 16 Civ. 2517 (AT), 2022 WL 889259, at *5 (S.D.N.Y. Mar. 25, 2022) (citing West v. Atkins, 487 U.S. 42, 48 (1988)).  "In order to state a claim under [Section] 1983, a plaintiff must allege that he was injured by either a state actor or a private party acting under color of state law."  Ciambriello v. Cnty. of Nassau, 292 F.3d 307, 323 (2d Cir. 2002); see Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 691 (1978).

"To act under color of state law or authority for purposes of Section 1983, the defendant must 'have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" Savarese v. City of New York, 547 F. Supp. 3d 305, 337 (S.D.N.Y. 2021) (quoting Monsky v. Moraghan, 127 F.3d 243, 245 (2d Cir. 1997)). The Court must assess whether the alleged constitutional violations "have been committed by a person acting under color of state law[.]" Cornejo v. Bell, 592 F.3d 121, 127 (2d Cir. 2010) (quoting Pitchell v. Callan, 13 F.3d 545, 547 (2d Cir. 1994)). The burden is on the plaintiff to "indicate that the challenged action was 'fairly attributable to the State.'" Vasquez v. Garcia, 432 F. Supp. 3d 92, 97 (D. Conn. 2019) (quoting Lugar v. Edmondson Oil Co., 457 U.S. 922, 937 (1982)).

Brown's claims about the conditions of his detention are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Eighth Amendment. See City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983) ("'[T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law.'") (quoting Ingraham v. Wright, 430 U.S. 651, 671 n.40 (1977)); Vail v. City of New York, No. 18 Civ. 11822 (VEC) (SLC), 2020 WL 3548074, at *3 (S.D.N.Y. May 15, 2020), adopted by, 2020 WL 3547736 (S.D.N.Y. June 30, 2020). "[A] pre-trial detainee's constitutional rights are at least as great as those of a prisoner," and thus the protections under the Fourteenth Amendment Due Process Clause "are coextensive with those afforded by the Eighth Amendment." Jean-Laurent v. Wilkerson, 438 F. Supp. 2d 318, 324 (S.D.N.Y. 2006); see Virella v. Pozzi, No. 05 Civ. 10460 (RWS), 2006 WL 2707394, at *3

(S.D.N.Y. Sept. 20, 2006) ("The Second Circuit applies the same standard to excessive force claims brought under the Fourteenth Amendment as under the Eighth Amendment.").

### a. Conditions of Confinement

To state a Section 1983 claim based on the conditions of confinement, a pre-trial detainee "must plead facts that would, if believed, give rise to a plausible inference of deliberate indifference to a serious deprivation." Tyler v. Argo, No. 14 Civ. 2049 (CM) (DCF), 2014 WL 5374248, at *6 (S.D.N.Y. Oct. 10, 2014) (citing Estelle v. Gamble, 429 U.S. 97, 104–05 (1976)). This requires the plaintiff to satisfy both an objective and a subjective standard. See Darnell, 849 F.3d at 29. The objective standard requires a "showing that the challenged conditions were sufficiently serious to constitute objective deprivations of the right to due process[.]" Id. The subjective standard requires a "showing that the officer acted with at least deliberate indifference to the challenged conditions[,]" "acted intentionally[,]" or "recklessly failed to act with reasonable care." Id. at 29, 35.

### i. Objective Element

Although the Constitution "does not mandate comfortable prisons," Rhodes v. Chapman, 452 U.S. 337, 349 (1981), prison officials "must provide humane conditions of confinement[.]" Farmer v. Brennan, 511 U.S. 825, 832 (1994). "Courts assess allegations of unconstitutionally unsanitary conditions of confinement on a case-by-case basis according to their severity and duration." Vail, 2020 WL 3548074, at *3 (citing Darnell, 849 F.3d at 30). "[T]here is no static test to determine whether a[n unsanitary condition] is sufficiently serious; [t]he conditions themselves must be evaluated in light of contemporary standards of decency." Jabbar v. Fischer, 683 F.3d 54, 57 (2d Cir. 2012). A condition is "'objectively, sufficiently serious'" if it denies the

pre-trial detainee "'the minimal civilized measure of life's necessities[.]'"  Gaston v. Coughlin, 249 F.3d 156, 164 (2d Cir. 2001) (quoting Farmer, 511 U.S. at 834); see D'Attore v. New York City, No. 10 Civ. 3102 (JSR) (MHD), 2011 WL 3629166, at *5 (S.D.N.Y. June 2, 2011) (quoting Gaston, 249 F.3d at 164), adopted as modified, 2011 WL 3629018 (S.D.N.Y. Aug. 17, 2011).  The conditions of confinement "may be aggregated to rise to the level of a constitutional violation, but 'only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise.'"  Walker v. Schult, 717 F.3d 119, 125 (2d Cir. 2013) (quoting Wilson v. Seiter, 501 U.S. 294, 304 (1991)).  "Moreover, while a serious injury is not necessary to establish an objective deprivation [], 'the seriousness of the harms suffered . . . may shed light on the severity of an exposure.'"  Vail, 2020 WL 3548074, at *4 (quoting Willey v. Kirkpatrick, 801 F.3d 51, 68 (2d Cir. 2015)).

### ii.    Subjective Element

The subjective element of a Section 1983 conditions of confinement claim requires the pre-trial detainee to show that the "defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety."  Darnell, 849 F.3d at 35.  "Mere negligence is insufficient."  Vail, 2020 WL 3548074, at *4 (citing Darnell, 849 F.3d at 36); see Tyler, 2014 WL 5374248, at *6 ("'Mere negligence' and ordinary lack of due care for a prisoner's interest or safety does not violate the Constitution.") (quoting Farmer, 511 U.S. at 835).  The "official's state of mind must amount to 'the equivalent of criminal recklessness; namely, when the prison

official knows of and disregards an excessive risk to inmate health or safety[.]'" Tyler, 2014 WL 5374248, at *6 (quoting Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996)).

### b. Municipal Liability

To prove municipal liability against the City, Brown must establish that conduct pursuant to official municipal policy caused his alleged constitutional injury. See Monell, 436 U.S. at 691; Blue, 2018 WL 1136613, at *18; Triano v. Town of Harrison, 895 F. Supp. 2d 526, 531 (S.D.N.Y. 2012) ("[T]here must be a 'direct causal link between a municipal policy or custom and the alleged constitutional deprivation.'"). Failure to establish an underlying constitutional violation necessarily defeats a Monell claim. See Askins v. Doe, 727 F.3d 248, 253 (2d Cir. 2013); Blue, 2018 WL 1136613, at *18; Byrd, 2018 WL 259316, *12–13.

### 3. PLRA

### a. Statutory Exhaustion

A pre-trial detainee asserting a Section 1983 claim must first exhaust his administrative remedies in accordance with the PLRA. See Ruggiero v. Cnty. of Orange, 467 F.3d 170, 173 (2d Cir. 2006); Massey v. City of New York, No. 20 Civ. 5665 (GBD) (DF), 2021 WL 4943564, at *1 (S.D.N.Y. Aug. 30, 2021) (applying PLRA exhaustion requirements to pre-trial detainee), adopted by, 2021 WL 4459459 (S.D.N.Y. Sept. 29, 2021), aff'd, 2021 WL 5234977 (S.D.N.Y. Nov. 9, 2021); Arnold v. Westchester Cnty., No. 09 Civ. 3727 (JSR) (GWG), 2010 WL 3397375, at *4–6 (S.D.N.Y. Apr. 16, 2010) (same), adopted by, 2010 WL 3397372 (S.D.N.Y. Aug. 25, 2010). The PLRA provides that "[n]o action shall be brought with respect to prison conditions under [Section 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are

exhausted." 42 U.S.C. § 1997e(a). "Exhaustion is 'mandatory' and 'applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes[,]'" or allege excessive force, the denial of adequate medical care, or another wrong. Hernandez v. Coffey, 582 F.3d 303, 305 (2d Cir. 2009) (quoting Porter v. Nussle, 534 U.S. 516, 524 (2002)); see Ross v. Blake, 578 U.S. 632, 639 (2016) (holding that PLRA's "mandatory exhaustion regime[] foreclose[ed] judicial discretion" to craft exceptions to exhaustion requirement).

Exhaustion under the PLRA means "proper exhaustion" of administrative remedies, i.e., "exhaustion in 'compliance with an agency's deadlines and other critical procedural rules.'" Lucente v. Cnty. of Suffolk, 980 F.3d 284, 311 (2d Cir. 2020) (quoting Woodford v. Ngo, 548 U.S. 81, 90–91 (2006). Proper exhaustion requires "using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits)." Woodford, 548 U.S. at 90; see also Lowman v. Baird, No. 16 Civ. 6518 (VSB), 2017 WL 6403519, at *5 (S.D.N.Y. Dec. 14, 2017) ("The PLRA requires 'proper exhaustion,' which obligates prisoners to 'complete the administrative review process in accordance with the applicable procedural rules—rules that are defined not by the PLRA, but by the prison grievance process itself.'") (quoting Jones v. Bock, 549 U.S. 199, 218 (2007)).

Failure to exhaust administrative remedies under the PLRA is an affirmative defense, see Johnson v. Rowley, 569 F.3d 40, 45 (2d Cir. 2009), and thus a pre-trial detainee "need not plead administrative exhaustion in his complaint." Hickman v. City of New York, No. 20 Civ. 4699 (RA) (OTW), 2021 WL 3604786, at *2 (S.D.N.Y. Aug. 12, 2021). The Court may nevertheless dismiss a complaint at the pleading stage for failure to exhaust "if the defense 'appears on the face of the complaint.'" Antrobus v. Warden of GVRC, No. 11 Civ. 5128 (JMF), 2012 WL 1900542, at *2

(S.D.N.Y. May 25, 2012) (quoting Pani v. Empire Blue Cross Blue Shield, 152 F.3d 67, 74 (2d Cir. 1988)). Thus, "courts within this District routinely grant motions to dismiss where a plaintiff's non-exhaustion is clear from the face of the complaint." Hickman, 2021 WL 3604786, at *2 (collecting cases); see Stokes v. de Blasio, No. 17 Civ. 7890 (JGK), 2019 WL 132279, at *3 (S.D.N.Y. Jan. 8. 2019) (granting motion to dismiss complaint that showed on its face that inmate did not exhaust administrative procedures); see Rivera v. Anna M. Cross Ctr., No. 10 Civ. 8696 (RJH), 2012 WL 383941, at *2 (S.D.N.Y. Feb. 7, 2012) ("If non[-]exhaustion is clear, a motion to dismiss should be granted.").

### b. DOC Exhaustion Procedures

Pursuant to Directive 3367R-A, DOC "maintains a robust administrative grievance procedure—the [IGRP]—for inmates [and pre-trial detainees] at all of its facilities[,]" including those at Rikers Island. Leneau v. City of New York, No. 16 Civ. 0893 (RA), 2018 WL 583120, at *3 (S.D.N.Y. Jan. 26, 2018); see Hickman, 2021 WL 3604786, at *3 ("At Rikers Island, grievance procedures are governed by the [IGRP].").[5] The IGRP applies to "[a]ny inmate who is directly and personally affected by an issue, condition, practice, service, or lack of an accommodation with regard to any issue that may arise in connection with their incarceration or action relating to [his] confinement[.]" IGRP § I. The IGRP applies to complaints based on the conditions of

---

[5] The Court takes judicial notice of the IGRP in analyzing the Motion. See Massey, 2021 WL 4943564, at *6 n.9 (taking judicial notice of IGRP in evaluating pre-trial detainee's Section 1983 claims); Sanders v. City of New York, No. 16 Civ. 7246 (PGG), 2018 WL 3117508, at *4 n.1 (S.D.N.Y. June 25, 2018) ("It is a 'common practice in this District' to take 'judicial notice of the version of the IGRP in effect at the time of the events giving rise to [a prisoner's] claim.'") (quoting Leneau, 2018 WL 583120, at *1). Directive 3376R-A was in effect during the relevant period and is therefore the governing grievance procedure for Brown's claims. See Directive – Inmate Grievance Procedures, THE CITY OF NEW YORK DEPARTMENT OF CORRECTION, https://www1.nyc.gov/assets/doc/downloads/directives/Directive_3376R-A.pdf (last visited Jan. 26, 2023).

confinement.  See Taylor v. N.Y.C. Dep't of Corr., 849 F. App'x 5, 6 (2d Cir. 2021) (summary order) (recognizing that IGRP applied to inmate's complaint "that he was given inadequate clothing in prison, and that he experienced difficulty in mailing legal correspondence and accessing legal services").

The IGRP requires an inmate with a grievance to:

> first either file a grievance, using the Form 7101R ("OCGS Statement Form"), or call 311 to file a complaint.  IGRP §§ V(F), (H).  Within seven business days, the Grievance Coordinator will assess the inmate's submission and determine whether it should be dismissed and closed, referred to a different entity, or investigated further.  IGRP § VI(A)(1).  Upon the close of a further investigation, the Grievance Coordinator will meet with the inmate to propose a resolution.  Id. If the inmate is not satisfied with the proposed resolution of the grievance, he can then appeal to the Commanding Officer.  Id. § VII(A).  If the inmate is dissatisfied with the decision of the Commanding Officer, he may then submit an appeal to the Division Chief.  Id. § VIII(A)(1[–]2).  Lastly, if the inmate is dissatisfied with the decision of the Division Chief, he may appeal to the Central Office Review Committee ("CORC").  Id. § IX(A).  The CORC's disposition constitutes the final decision on the grievance.  Id.

Massey, 2021 WL 4943564, at *7.  The IGRP requires that "[a]n inmate must use the grievance process to obtain a final response from [DOC] regarding any grievance[.]"  IGRP § V(K).  An inmate's prediction that his grievance will be denied, "even if wholly reasonable, does not warrant depriving the prison administration of the opportunity to address the claim in the first instance, a paramount goal of the PLRA."  Johnson v. Killian, No. 07 Civ. 6641 (LTS) (DFE), 2009 WL 1066248, at *5 (S.D.N.Y. Apr. 21, 2009); see Dixon v. Laboriel, No. 01 Civ. 3632 (LAP), 2010 WL 2365860, at *4 (S.D.N.Y. June 10, 2010) (explaining that "the alleged ineffectiveness of the administrative remedies that are available does not absolve a prisoner of his obligation to exhaust such remedies"), aff'd, 433 F. App'x 48 (2d Cir. 2011) (summary order).  In this District, "[i]t is well-established that, even if an inmate does not receive a response to his grievance, he

fails to exhaust administrative remedies if he does not avail himself of the available appeals process." <u>Leneau</u>, 2018 WL 583120, at *3; <u>see Tyler</u>, 2014 WL 5374248, at *4 ("It is well settled that an inmate who receives no response to his grievance must continue with the next steps in the grievance process[].").  "[P]roper exhaustion" thus means that an inmate must "not only file an initial grievance, but also [] exhaust his claims through each level of the specified grievance process." <u>Massey</u>, 2021 WL 4943564, at *7; <u>see Perez v. City of New York</u>, No. 14 Civ. 7502 (LGS), 2015 WL 3652511, at *3 (S.D.N.Y. June 11, 2015) (noting that DOC "inmate must take each of the four [IGRP] steps to exhaust the administrative grievance process") (citing <u>Tyler</u>, 2014 WL 5374248, at *4); <u>Banks v. Mental Health Clinicians</u>, No. 11 Civ. 7848 (LAP), 2012 WL 6201259, at *3–4 (S.D.N.Y. Dec. 11, 2012) (granting motion to dismiss claims of Rikers Island inmate who filed grievance but failed to appeal and therefore did not exhaust IGRP process under PLRA); <u>Graham v. Cochran</u>, No. 96 Civ. 6166 (LTS) (RLE), 2002 WL 31132874, at *6 (S.D.N.Y. Sept. 25, 2002) ("Courts have interpreted the [PLRA] to require complete exhaustion in accordance with institutional procedures.").  Courts in this District have recognized that the IGRP process takes at least 20 days to complete.  <u>See Thompson v. Carter</u>, No. 21 Civ. 8982 (LGS), 2022 WL 2533112, at *3 (S.D.N.Y. July 7, 2022) (recognizing that, under the IGRP, "[t]he facility was entitled to take twenty-five days or more to resolve all levels of appeal"); <u>see also Miller v. Annucci</u>, No. 17 Civ. 4698 (KMK), 2019 WL 4688539, at *12 (S.D.N.Y. Sept. 26, 2019) (collecting cases dismissed for failure to exhaust IGRP in which the period between the date of the alleged incident and the filing of the complaint was 21 days or less).

### c.  Excusing the Exhaustion Requirement

The Court may excuse an inmate's failure to exhaust only on a finding that the administrative remedies were "unavailable" to him.  Massey, 2021 WL 4943564, at *8.  The Supreme Court explained in Ross v. Blake the three circumstances in which administrative remedies may be deemed unavailable:

> First, . . . an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end— with officers unable or consistently unwilling to provide any relief to aggrieved inmates . . . . Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use.  In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it . . . . And finally, the same is true when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.

136 S. Ct. at 1859–60.  With this guidance, the Second Circuit has explained that "'[t]he test for deciding whether the ordinary grievance procedures were available must be an objective one: that is, would a similarly situated individual of ordinary firmness have deemed them available.'" Lucente, 980 F.3d at 311–12 (quoting Hemphill v. New York, 380 F.3d 680, 686 (2d Cir. 2004), abrogated on other grounds, Ross, 136 S. Ct. at 1855)).

### B.  Application

Liberally construing the Complaint, the Court interprets Brown to be asserting a claim under Section 1983 that the City violated his Fourteenth Amendment rights by failing to implement appropriate COVID-19 protocols at AMKC.  (See ECF No. 1 at 2–5).  See, e.g., Massey, 2021 WL 4943564, at *1 (interpreting pretrial detainee's allegations to assert Section 1983 claims).  In the Motion, the City argues that no reasonable jury could find for Brown on either the objective or the subjective prongs of his claim, and, in the absence of an underlying constitutional

violation, the City cannot be liable under <u>Monell</u>.  (ECF No. 36 at 15–22).  In addition, the City argues that Brown has failed to exhaust his administrative remedies under the IGRP.  (<u>Id.</u> at 23–27).  The Court considers each of these arguments below.[6]

### 1.  Conditions of Confinement

"It is well settled that 'correctional officials have an affirmative obligation to protect inmates from infectious disease.'"  <u>Morales v. Brann</u>, No. 20 Civ. 10126 (VEC) (SDA), 2022 WL 18108561, at *4 (S.D.N.Y. Dec. 15, 2022) (quoting <u>Jolly v. Coughlin</u>, 76 F.3d 468, 477 (2d Cir. 1996)), <u>adopted by</u>, 2023 WL 35255 (S.D.N.Y. Jan. 4, 2023).  Further, "[i]t is 'undisputed—and, indeed, by now common knowledge—that COVID-19 is a highly dangerous disease that poses a significant risk of severe illness and death.'"  <u>Gil-Cabrera v. Dep't of Corr.</u>, No. 20 Civ. 09493 (LTS) (SDA), 2021 WL 5282620, at *4 (S.D.N.Y. Sept. 27, 2021) (quoting <u>James v. Annucci</u>, No. 20 Civ. 6952 (CJS), 2021 WL 3367530, at *2 (W.D.N.Y. Aug. 3, 2021)), <u>adopted</u> <u>sub</u> <u>nom.</u>, <u>Gil-Cabrera v. City of New York</u>, 2021 WL 5910055 (S.D.N.Y. Dec. 14, 2021); <u>see</u> <u>Singleton v. City of New York</u>, No. 20 Civ. 8570 (ALC), 2022 WL 4620174, at *7 (S.D.N.Y. Sept. 30, 2022) (quoting <u>Gil-Cabrera</u>, 2021 WL 5282620, at *3); <u>Fernandez-Rodriguez v. Licon-Vitale</u>, 470 F. Supp. 3d 323, 349 (S.D.N.Y. 2020) ("COVID-19 stands with the roster of infectious diseases from which correctional officials have an affirmative obligation to protect inmates.").  Courts have therefore found that "an inmate can face a substantial risk of serious harm in prison from COVID-19 if a prison does not take adequate measures to counter the spread of the virus."  <u>Chunn v. Edge</u>, 465 F. Supp. 3d

---

[6] The City also argues that under the PLRA, Brown is precluded from recovering compensatory damages for emotional injuries because he does not allege any physical injury.  (ECF No. 36 at 27–28 (citing 42 U.S.C. § 1997e(e)).  Given the recommendation that the Motion be granted because Brown has failed to establish a conditions of confinement claim, the Court need not address whether this provision would limit the damages Brown could recover if he established a viable claim.

168, 200 (E.D.N.Y. 2020); see Morales, 2022 WL 18108561, at *4 (quoting Chunn, 465 F. Supp. 3d

at 200). Accordingly, in evaluating a conditions of confinement claim based on COVID-19, "[t]he

relevant inquiry is whether a petitioner has shown a substantial risk of serious harm from COVID-

19 at a correctional facility in light of the countermeasures that the facility has in place." Morales,

2022 WL 18108561, at *4 (citing Chunn, 465 F. Supp. 3d at 201).

### a. **Objective Element**

Were the Court evaluating Brown's Complaint on a motion to dismiss pursuant to Federal

Rule of Civil Procedure 12(b)(6), the Court might find that he had "plausibly [] alleged that he

faced a substantial risk of serious harm based on the conditions at [AMKC]." Gil-Cabrera,

2021 WL 5282620, at *4. At the summary judgment stage, however, with the City having

introduced evidence of the COVID-19 Plan, it was incumbent on Brown to come forward with

evidence showing that a genuine issue of material fact exists as to whether the measures that

DOC and CHS took were objectively deficient. See Wilson v. Annucci, No. 18 Civ. 391 (LEK) (TWD),

2020 WL 1979210, at *6–7 (N.D.N.Y. Apr. 23, 2020), adopted by, 2020 WL 5229375

(N.D.N.Y. Sept. 2, 2020) (granting summary judgment where incarcerated plaintiffs failed to

introduce evidence showing that they were exposed to unreasonable risk of serious damage to

their health). Brown's Sept. 2 Letter, which repeats the allegations in his Complaint (compare

ECF No. 1 with ECF No. 46), fails to meet that burden. His medical records, which span a period

of more than two years and the entire time of his confinement at AMKC, do not show any

symptoms nor diagnosis of asthma, and therefore, "he has not shown [that] he has a condition

or conditions that put him at increased risk of serious illness should he be infected[.]" Williams

v. Rodriguez, No. 20 Civ. 806 (VLB), 2021 WL 2037966, at *8 (D. Conn. May 21, 2021). In addition,

Brown does not dispute that he was screened for COVID-19 symptoms at least 17 times, and was tested, with negative results, three times. (ECF No. 35 ¶¶ 67–68). Nor does he dispute that "the spread of COVID-19 has been greatly diminished with the introduction of vaccines in the general public" and in DOC facilities, including AMKC. Williams, 2021 WL 2037966, at *8.

Further, the Court recognizes the decisions of other courts that have evaluated the conditions at DOC facilities and found that DOC and its related City agencies "have taken substantial measures to reduce the spread of the virus on Rikers Island, and have had success in doing so." People ex rel. Stoughton v. Brann, 185 A.D.3d 521, 525 (1st Dep't 2020); see People ex rel. Coleman v. Brann, 68 Misc.3d 204, 213–14 (Sup. Ct. Bronx Cnty. 2020) (joining "the large majority of courts" finding that "DOC has made substantial efforts to ameliorate [the health] risk by containing the spread of COVID-19 on Rikers Island" and collecting cases).

Accordingly, the Court finds that no reasonable jury could find that Brown had meets the objective prong of his conditions of confinement claim.

### b. Subjective Element

Even if the Court were to afford Brown additional solicitude and find that a genuine issue of material fact existed as to the objective element, Brown "cannot satisfy the subjective prong[]" because there is no evidence that the City "intentionally . . . impose[d] the alleged condition[s], or recklessly failed to act with reasonable care to mitigate the risk that the condition[s] posed to" him and other AMKC detainees. See Caraballo v. Dep't of Corr. City of New York, No. 22 Civ. 00971 (JLR), 2022 WL 16555313, at *4–5 (S.D.N.Y. Oct. 31, 2022). Rather, the City has "adduced significant evidence as to countermeasures put in place by DOC and CHS to minimize the risk to inmates of COVID-19." Morales, 2022 WL 18108561, at *4. Further, "[e]ven assuming [the City's]

response to COVID-19 was imperfect, or negligent, it is not enough to support a finding of deliberate indifference." Jones v. Westchester Cnty., No. 20 Civ. 8542 (PMH), 2022 WL 1406591, at *4–5 (S.D.N.Y. May 4, 2022) (granting motion to dismiss claim alleging prison officials failed to protect inmate from COVID-19); see Gibson v. Rodriguez, No. 20 Civ. 953 (KAD), 2021 WL 4690701, at *7 (D. Conn. Oct. 7, 2021) (granting summary judgment for defendants who implemented reasonable COVID-19 countermeasures such that plaintiffs had failed to create genuine issue of material fact as to deliberate indifference); see also Stoughton, 185 A.D.3d at 525 ("Far from acting recklessly, respondents have demonstrated great care to ensure the safety of everyone who enters [Rikers Island]. By any objective measure, they have been anything but indifferent to the risk that COVID-19 poses to the jail population.").

Accordingly, the Court also finds that no reasonable jury could find that Brown meets the subjective prong of a conditions of confinement claim. Because he has not demonstrated that a genuine issue of material fact exists as to his conditions of confinement claim under Section 1983, I respectfully recommend that the City's Motion be GRANTED.

### c. **Municipal Liability**

Because Brown's underlying Section 1983 claim fails, he cannot establish the City's municipal liability under Monell. "Monell does not provide a separate cause of action . . . [but instead] extends liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." Segal v. City of New York, 459 F.3d 207, 219 (2d Cir. 2006). "Without any underlying constitutional violations, [Brown]'s Monell claim must be dismissed." Thompson v. City of White

Plains, No. 13 Civ. 6602 (NSR), 2015 WL 4597433, at *5 (S.D.N.Y. July 29, 2015) (granting motion for summary judgment).

### 2. **Exhaustion**

Brown's claims are based on his detention at AMKC until at least April 22, 2021, the date he delivered the Complaint to prison authorities for mailing.  (ECF No. 1 at 4, 7).  Although Brown submitted at least two grievances (ECF No. 41 ¶¶ 4–5; see ECF No. 46 at 3), neither the evidence the City has submitted nor the Letters demonstrate that he completed the appeals process under the IGRP, which is necessary for a finding that he exhausted his administrative remedies.  See Massey, 2021 WL 4943564, at *7 (explaining that inmate must both file initial grievance and complete "each level of the specified grievance process").  Here, Brown filed the Complaint 16 days after the First Grievance, and five days after the Second Grievance, less than the 20 days or more that courts have recognized is necessary to afford the DOC an opportunity to complete the IGRP process.  See Thompson, 2022 WL 2533112, at *3; Miller, 2019 WL 4688539, at *12. Therefore, Brown "could not have participated in the entire grievance process [under the IGRP] before filing his [C]omplaint."  Stokes, 2019 WL 132279, at *3 (dismissing for failure to exhaust IGRP procedures where complaint was filed fourteen days after alleged incident); see Cary v. City of New York, No. 17 Civ. 6443 (RWS), 2018 WL 1581988, at *3 (S.D.N.Y. Mar. 27, 2018) (dismissing for failure to exhaust IGRP procedures where complaint was submitted less than 30 days after alleged incident); Pierre-Louis v. Martinez, No. 12 Civ. 2240 (NGG) (LB), 2014 WL 4161960, at *4–5 (E.D.N.Y. Aug. 19, 2014) (dismissing for failure to exhaust IGRP where complaint was submitted three weeks after alleged incident).

Construing the Letters generously, Brown could be arguing that exhaustion should be excused on the ground that the DOC officials' failure to address his past grievances means that the administrative remedies under the IGRP "should be considered unavailable to him" under Ross. Massey, 2021 WL 4943564, at *9 (interpreting pro se inmate to be asserting that exhaustion was excused because administrative remedies were unavailable). The Court finds that Brown has failed to demonstrate that the IGRP was unavailable to him, as would justify excusing him from the exhaustion requirement under the PLRA. Brown admits that he filed as many as five grievances, and that he received a response to at least one of them, (ECF No. 46 at 3), demonstrating that the IGRP procedures were not only available, but that he knew how to employ them and simply chose not to follow them to completion. See Perez, 2015 WL 3652511, at *4 (finding that plaintiff's "timely fil[ing] his grievance . . . indicate[d] that the procedure was available to him"). In addition, "prison officials' failure to respond to some of [his] grievances [does] not render the IGRP administrative procedure unavailable." Taylor, 849 F. App'x at 8; see Lopez, 136 F. Supp. 3d at 584 (finding that any delay by officials in responding to grievance did not excuse failure to exhaust remaining grievance procedures). Moreover, nothing in Brown's submissions suggests that "any [] official prevented [him] from filing a grievance" or completing the remaining steps in the IGRP. Perez, 2015 WL 3652511, at *4. Finally, the Court cannot discern any other permissible ground to excuse Brown's failure to comply with the IGRP.

Accordingly, Brown's failure to exhaust his administrative remedies "cannot be excused on the ground that a meaningful avenue for exhaustion was unavailable[,]" Massey, 2021 WL 4943564, at *11, and provides an alternative basis to grant the Motion.

## IV. CONCLUSION

For the reasons set forth above, I respectfully recommend that the Motion be GRANTED and the Complaint be DISMISSED WITH PREJUDICE.

Defendant shall serve a copy of this Report and Recommendation on Brown by **January 31, 2023**, and promptly file proof of service on the docket.

The Clerk of the Court is respectfully directed to mail a copy of this Report and Recommendation to Brown.

Dated:      New York, New York
            January 30, 2023


_____
SARAH L. CAVE
United States Magistrate Judge

*                        *                        *

**NOTICE OF PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

The parties shall have fourteen (14) days (including weekends and holidays) from service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure.  See also Fed. R. Civ. P. 6(a), (d) (adding three additional days when service is made under Fed. R. Civ. P. 5(b)(2)(C), (D) or (F)).  A party may respond to another party's objections within fourteen (14) days after being served with a copy.  Fed. R. Civ. P. 72(b)(2).  Such objections, and any response to objections, shall be filed with the Clerk of the Court.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), (d), 72(b).  Any requests for an extension of time for filing objections must be addressed to Judge Gardephe.

**FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.**  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), (d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).  If Brown does not have access to cases cited in this Report and Recommendation that are reported on Westlaw, he may request copies from Defendant's counsel.  See Local Civ. R. 7.2.